FILED

2005 Sep-30  PM 01:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| OMA HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CV 04-B-0019-NE |
| | ) |
| CENTERS FOR THE DEVEL-OPMENTALLY DISABLED NORTH CENTRAL ALABAMA, INC., | ) ) ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment, (doc. 17); plaintiff's Motion to Strike Defendant's Brief in Support of Motion for Summary Judgment, (doc. 19); plaintiff's Motion to Strike Defendant's Reply Brief, (doc. 26); plaintiff's Motion to Strike Romine Affidavit, (doc. 27); defendant's Motion to Strike Portions of Declarations, (doc. 24); and defendant's Motion to Strike Portions of Plaintiff's Statement of Facts, (doc. 25). Plaintiff Oma Harris has sued her former employer, defendant Centers for the Developmentally Disabled North Central Alabama, Inc., alleging that defendant discriminated against her on the basis of her age in violation of federal law. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 17), is due to be granted; plaintiff's Motion to Strike Defendant's Brief in Support of Motion for Summary Judgment, (doc. 19), is due to be denied; plaintiff's Motion to Strike

Defendant's Reply Brief, (doc. 26), is due to be denied; plaintiff's Motion to Strike Romine Affidavit, (doc. 27), is due to be granted; defendant's Motion to Strike Portions of Declarations, (doc. 24), is due to be granted in part and denied in part; and defendant's Motion to Strike Portions of Plaintiff's Statement of Facts, (doc. 25), is due to be denied.

## I. <u>MOTIONS TO STRIKE</u>

### A. PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff has asked the court to strike defendant's Brief in Support of its Motion for Summary Judgment on the ground that the brief has more than twenty pages.  (Doc. 19.)

Exhibit A to the 16(b) Scheduling Order  states –

> Initial briefs are limited to 20 pages; reply briefs are limited to 10 pages.  [Note]

[Note]  These page limits include statement of facts and any legal argument.

(Doc. 7, Ex. A at 2 and n.3.)  The Statement of Facts and Argument sections of defendant's brief are 20 pages long.  (Doc. 16.)

Therefore, plaintiff's Motion to Strike Defendant's Brief in Support of Motion for Summary Judgment, (doc. 19), will be denied.

### B. DEFENDANT'S MOTION TO STRIKE PORTIONS OF DECLARATIONS

Defendant contends that portions of the Declarations  of Connie Griffin and Shelia Sobotka are due to stricken on the grounds of irrelevancy, hearsay, inadmissible opinion testimony, and lack of personal knowledge.  (Doc. 24.)

### 1. Griffin's Declaration

Defendant asks the court to strike paragraphs 4, and 6-10 of Griffin's Declaration, which is Exhibit 21 of plaintiff's evidentiary submission.  Based on the court's review of the record, defendant's Motion to Strike portions of Griffin's Declaration, (doc. 24),will be granted in part and denied in part.  The Motion will be granted as to paragraphs 6-10; the court finds that paragraphs 6-10 are due to be stricken as the testimony therein is irrelevant to the summary judgment issues.  However, the Motion will be denied as to paragraph 4, which states when Romine and Dylan Jackson joined defendant's Board of Directors.  Such testimony is not irrelevant, hearsay, or opinion testimony, and it is based on Griffin's personal knowledge.

### 2. Sobotka's Declaration

Defendant asks the court to strike paragraphs 4, 6, 7, 13, 15, and 16 of Sobotka's Declaration, which is Exhibit 22, of plaintiff's evidentiary submission.  Based on the court's review of the record, defendant's Motion to Strike portions of Sobotka's Declaration, (doc. 24),  will be granted in part and denied in part.  The Motion will be granted as to all targeted paragraphs, except paragraph 16, as irrelevant to the summary judgment issues.  However, the Motion will be denied as to paragraph 16, which states that Residential Services Supervisors delegated their duties to staff persons.  This testimony is not irrelevant, inadmissible hearsay, or opinion testimony, and it is based on Sobotka's personal knowledge.

## C.   DEFENDANT'S MOTION TO STRIKE PORTIONS OF PLAINTIFF'S STATEMENT OF FACTS

Defendant asks the court to strike portions of plaintiff's Statement of Facts "on the grounds that they are inaccurate or have no factual foundation." (Doc. 25.) Defendant had an opportunity in its Reply Brief to alert the court to any factual statements or argument it contends is inaccurate or not supported by the evidence in the record. The court has considered plaintiff's Statement of Facts to the extent supported by record evidence in deciding defendant's Motion for Summary Judgment.

Therefore, defendant's Motion to Strike Portions of Plaintiff's Statement of Facts, (doc. 25), will be denied.

## D.  PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S REPLY BRIEF

Plaintiff contends that defendant's Reply Brief is due to be stricken because it raises issues regarding plaintiff's prima facie case that were not raised in its initial brief. In its initial brief, defendant addressed only plaintiff's claim that she was terminated because of her age, which is arguably the only claim set forth in her Complaint.[1] (Doc. 26.) However, in her Brief in Opposition to Defendant's Motion for Summary Judgment, plaintiff argues

---

[1]Although plaintiff notes in her Complaint that her position as Residential Services Supervisor was eliminated and that she accepted a position as House Manager thereafter, she does not allege that this employment action was discriminatory. (Doc. 1 ¶¶ 11, 12.) Moreover, her complaint identifies her termination as the only adverse job action. (*Id*. ¶13 ("Harris believes . . . that her termination was based substantially in part on her age (52). Harris is over the age of 40, was qualified for her position, suffered an adverse employment action, i.e., termination, and was replaced in her position as supervisor by two women in their early 20's.").)

that she was demoted.  Defendant's additional discussion of the elements of a prima facie case address only this demotion claim.

Therefore, plaintiff's Motion to Strike Defendant's Reply Brief, (doc. 26), will be denied.

## E.  PLAINTIFF'S MOTION TO STRIKE THE AFFIDAVIT OF MAURICE BRADLEY ROMINE AND EXHIBITS ATTACHED THERETO

Plaintiff asks the court to strike the affidavit of Maurice Bradley Romine because the affidavit was untimely filed.  (Doc. 27 at 10.)  She contends, "By using his Affidavit in reply to the Plaintiff's response, the Defendant has 'sandbagged' the Plaintiff to the point where the Plaintiff now has no opportunity to respond to the numerous contradictory and hearsay statements contained in the Affidavit."  (*Id*.)

The court's Exhibit A to the 16(b) Scheduling Order requires the moving party to file "***all*** evidentiary materials . . . simultaneously with the motion," and it allows the moving party to file a reply brief after the opponent's response.  (Doc. 7, Ex. A at 1 [emphasis added].)  Nothing in Exhibit A allows the moving party to submit evidentiary material ***after*** the opponent's response.  The reason for this is obvious – Fed. R. Civ. P. 56(c) requires the court to allow the non-moving party at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment."  *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990)(citing, *inter alia*, *Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2d Cir.1980) ("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")).

> Recognizing the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment, this circuit has strictly enforced the requirement of a 10 day advance notice that the court will take a motion for summary judgment under advisement as of a certain date. . . . The reasons for such a requirement are premised on the fact that disposition of a case on summary judgment grounds represents a final adjudication on the merits. It forecloses subsequent litigation on the matter; it is accordingly important that proper notice be given so as to insure "opportunity to present every factual and legal argument available.

*Id.* (internal quotations and citations omitted).  Under the court's Exhibit A, the non-moving party does not have an opportunity to respond to evidence submitted with the moving partiy's reply brief.  (*See* doc. 7, Ex. A at 1.)

When faced with additional evidence submitted by the moving party after the time set for the non-moving party to file all its evidence in opposition to the motion, a court has two options: "it [can] strike the [evidence] or grant . . . the nonmoving party the opportunity to respond to it."  *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998)("Appellants contend that the district court had no 'permissible choice' but to allow a surreply once it had accepted the materials in Seagate's reply. That contention is incorrect. Having accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief.").  In this case, the court chooses to strike the evidence.

Therefore, plaintiff's Motion to Strike the Affidavit of Maurice Bradley Romine and Exhibits Attached Thereto, (doc. 27), will be granted. The Affidavit of Maurice Bradley Romine, together with its attachments, (doc. 23, Ex. A), will be stricken from the record. The Affidavit and its attachments have not been considered by the court in deciding defendant's Motion for Summary Judgment.

## II. <u>MOTION FOR SUMMARY JUDGMENT</u>

### A. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the

non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.

*See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d

1534, 1540 n.12 (11th Cir. 1988).

## B.  STATEMENT OF FACTS

Plaintiff began her employment with defendant on July 13, 1994 as a direct care

employee.  (Doc. 22, Ex. 1 at 16.)  In 1996, she was promoted to the position of Residential

Services Supervisor ["RSS"].  (*Id.* at 16-17; *id.*, Exs. 12 and 14.)  As an RSS, plaintiff was

responsible for "ensur[ing] that the clients' well-being was taken care of," and "mak[ing]

sure that they had a good quality of life."  (*Id.*, ex. 1 at 27.)  This included providing "proper

meals, medication, doctor appointments, . . . [ensuring] the programs were carried out on a

daily basis and that there was no abuse or mistreatment."  (*Id.* at 27-28.)  Plaintiff delegated

some of these responsibilities to direct care employees.  (*Id.* at 28-29.)  The RSS was also

responsible for supervising the direct care staff at several homes.  (*Id.* at 19-21; *id*, ex. 14.)

Plaintiff testified that she "interview[ed] potential employees, recommend[ed] hiring," and

"recommend[ed] termination."  (*Id.*, Ex. 1 at 20.)  The position description for the RSS

position states, "This is an exempt supervisory position with responsibilities for hiring,

scheduling and supervision of direct care staff in a home, as well as monitoring the day-to-day operation [of] home(s) to ensure quality of service." (*Id*., Ex. 14.)

In July 2002, defendant employed four employees in the RSS position: (1) plaintiff; (2) Angela Montgomery, who was approximately 32 years old; (3) Barbara Bolden, who was approximately 23 years old; and (4) Jennifer McLeroy, who was approximately 27 years old. (Doc. 16, Ex. C; doc. 22, Ex. 2 at 69-70.) In early July 2002, Bolden and McLeroy resigned. (Doc. 22, Ex . 2 at 69-71; *id*., Ex. 7 at 2.) After, Bolden and McElroy resigned, the Board voted to eliminate the RSS position and created the position of House Manager. (*Id*., Ex. 2 at 60, 69-71; *see id*, Ex. 15.) The position description of House Manager states, "This is a supervisory position with responsibilities for direct care, scheduling and supervision of Residential Assistants in a home, as well as monitoring the day-to-day operation of the home(s) to ensure quality of service." (*Id*., Ex. 15.)

Brad Romine served as Chairman of defendant's Board of Directors from 1994 until 2000. (*Id*., Ex. 2 at 21.) In 1999 or 2000, Dylan Jackson was elected to defendant's Board, and in 2002, he was Chairman of the Board. (*Id*., Ex. 5 at 12, 25-26.) In June 2002, Jackson was 42 years old, (*id*. at 74), and Romine was approximately 36 years old, (doc. 16, Ex. C).

In early August 2002, defendant contacted plaintiff to interview for a House Manager position. (*See id*., Ex. 11.) After the interview was scheduled, plaintiff sent a memo to Sharon Johnson, acting CEO, and Sheila Sobotka, Residential Services Manager, which stated:

9

I am not interested in being demoted to a House Manager.  I have worked as a Supervisor since 1995.  I have been the only one that has been dedicated enough to stay with this position.

There is not a home within [defendant] that I have not supervised at one time or other.  I have been heavily depended on to get homes certified. Medical is my high point of experience.  The supervision side of [defendant] has not been just supervising staff.  I have been depended on for every standard within the state guidelines.  I have enjoyed all the duties that have been assigned to me.

When this system of House Manager gets set up[, t]here will have to be someone to in-service and train the managers.  With my time as a supervisor and my knowledge of all the standards I am best for the job.

(*Id*.)

After plaintiff learned that her RSS position was eliminated, she agreed to consider the House Manager position.  (*Id*., Ex. 12.)  In a memo addressed to the "Executive Chairman," plaintiff stated:

Since the Residential Supervisor positions are being deleted from the Residential Program within [defendant], I am interested in the House Manager position.

. . .

I have recommended in the past that the homes go to the House Manager positions.  This was over looked and I was told that if this were done [then] the supervisor[s] would not be needed.  I agree that four supervisor[s] will not be needed.  It is my opinion that a supervisor is needed especially at this time.  My major concerns are that the homes may not get certified at the next review.

The House Managers that will be taking over need[ ] training on all standards.  There are guidelines that the new managers will not be aware of that are very urgent to keeping a home certified.  It took me a long time and a few reviews to understand what the state is looking for.  The house managers

are going to have more to do than just keeping staff on shift [and] making sure that medication and doctor appointments are taken care of.

Before I am placed in a home I would like would like to be able to train the House Managers.  Since Ms. Sobotka is off on extended leave there is no one to train at this point.  I do believe at this time this is of the [utmost] importance to the residential program.

(*Id*.)

Despite plaintiff's request for a training or supervisory position over the House Managers, after her interview, defendant assigned her a House Manager position at the Pinedale Group Home.  (*Id*., Ex. 2 at 165-66.)  Pinedale was one of the more difficult houses to manage.  (*Id*. at 166.)  Romine testified that plaintiff was placed at Pinedale to justify her rate of pay, $11 an hour, which was hirer than the pay of other House Managers, $9 an hour. (*Id*. at 166-67.)

At the same time plaintiff was assigned to a House Manager position, the other remaining RSS, Angela Montgomery, was also assigned to a House Manager position. Montgomery was assigned to the 9th Avenue home, which was also a more difficult house to manage.  (*Id*.)  Montgomery also was making $11 an hour.  (*Id*. at 166.)

Plaintiff believes Montgomery was "doing rounds in all the homes in Huntsville," which had been her job as an RSS.  (*Id*., Ex. 1 at 54.)  This belief was based on reports from staff members at other houses.  (*Id*. at 54-55.)  She was told that Montgomery was "doing pill counts" and "reading the logbook and checking the homes out."  (*Id*. at 56.) Montgomery did not perform these duties at Pinedale.  (*Id*. at 57.)  Plaintiff does not know

11

if Montgomery supervised the staff at other homes.  (*Id.* at  59.)  Plaintiff does not know if Montgomery was just "helping out" at these other homes.  (*Id.* at 61.)

Plaintiff began working as a House Manager at Pinedale on or about August 9, 2002. (*Id.*, Ex. 1 at 107-08.)  Pinedale had been a home she supervised as an RSS.  (*Id.* at 20.) Less than a week later, she took medical leave for a week from August 13, 2002 until August 19, 2002.  (*Id.* at 108-09; *id.*, Ex. 13.)

During plaintiff's medical leave, Melissa Cooper, defendant's Human Resources Director, visited Pinedale.  (*Id.*, Ex. 4 at 44-45.)  She found the house was not clean; she testified there was thick scum and caked dirt in the house.  (*Id.* at 46, 48-49.)  At that time, Cooper did not contact plaintiff or take action to have the home cleaned; however, she did report the condition of the home to Sharon Johnson.  (*Id.* at 51, 53-54.)

Also, during the week that plaintiff was on sick leave, the residents of Pinedale had to be evacuated because the home was infested with fleas.  (*Id.*, Ex. 1 at 108.)  Plaintiff testified that the cat that had caused the flea problem was brought into the house during her week of sick leave.  (*Id.* at 109, 112.)  She testified that she evacuated the residents to a hotel and the house was treated for fleas.  (*Id.* at 115.)  Cooper testified that plaintiff had told her about a flea problem "weeks before" the clients were evacuated.  (*Id.*, Ex. 4 at 37.)  At that time, Cooper testified that plaintiff told her the problem was with two cats.  (*Id.* at 38.)

On August 20, 2002, Cooper wrote up plaintiff for (1) the uncleanliness of the home; (2) improper staff transfer from relief to full-time position at the Arthur Group Home; and (3) improper staff transfer from Andros Group Home to Pinedale.  (*See* doc. 16, Ex. I.)

Cooper prepared a Personnel Action Memorandum "[t]o discuss the Pinedale's Homes – unsanitary and unsafe environment."  (*Id.*, ex. 3.)  In this memorandum, Cooper wrote:

> 1.   The Pinedale Home has had an ongoing flea problem for an identified two weeks (or more).  To have gotten that bad – it had to have been going on for awhile.  Residents had to be moved into a motel it was so infested.  This is an unsafe environment.
>
> 2.   The Pinedale Home's environment is unclean as well.   The bathrooms look as if they have not been cleaned in awhile.  (thick layers of dust and hair on sink and behind toilet seat and B.M. on toilet seat).  The home also has a bad odor problem.

(*Id.*)  The memorandum stated, "If these matters are not taken care of immediately – this will result in suspension."  (*Id.*)

In the "Employee Comments" section of the memorandum, plaintiff wrote:

> I reported flea problem when I was notified by staff.  Pest control was called.  . . .  I have just returned from sick leave at the time Ms. Cooper saw the condition.  This will be corrected.  Home has always had a looking clean problem,  It can be scrubbed and still look dirty.

(*Id.*)

The second Personnel Action Memorandum prepared by Cooper on August 20, 2002, states that its purpose was "[t]o discuss [plaintiff's] error in not following [defendant's] procedure for transferring staff from a relief position to a full time position."  (*Id.*, ex. 4.)

This memorandum stated, "[Plaintiff] permitted Residential Assistant, Charles Medley, to transfer from a relief position to a 40 hr. full time position at Arthur without getting the proper documentation and approval through the Acting CEO." (*Id.*) Plaintiff responded to this memorandum by writing, "Mr. Medley has not been placed on 40 hours at this time. He is however relief stationed at Arthur St. This was done due to [an] emergency situation. Mr. Medley does want the transfer. I have not received anything in writing at this time." (*Id.*)

The third Personnel Action Memorandum prepared by Cooper states that its purpose is "[t]o discuss [plaintiff's] error in not following [defendant's] procedure for transferring a staff person from one home to another." (*Id.*, ex. 5.) Cooper noted that plaintiff had "permitted Residential Assistant, Tiffany Davis, to transfer from the Andres Home to the Pinedale Home without getting the proper documentation and approval through the Acting CEO." (*Id.*) Plaintiff responded that the transfer was "due to [an] emergency situation at both homes." (*Id.*)

On the same day that Cooper wrote up plaintiff, Romine made a motion before the Board to terminate plaintiff; the minutes of the Board meeting state, "Brad Romine made a motion that [defendant] terminate [plaintiff], House Manager[,] based on poor performance as supervisor. Frank Campbell seconded. A discussion followed. The motion carried." (Doc. 22, Ex. 11 at 1.) The vote to terminate plaintiff was unanimous. (*Id.*, Ex. 2 at 198.)

Romine testified that he made the motion to terminate plaintiff based on "information relayed to [him] about [plaintiff's] performance," from defendant's employees Cooper,

14

Sharon Johnson, Clara Johnson, and Miranda Tucker.  (*Id.*, Ex. 2 at 87-88.)  Before he recommended plaintiff's termination, Romine did not attempt to get plaintiff's version of the complaints.  (*Id.* at 93.)  Romine testified that he recommended plaintiff's termination "on [his] own volition."  (*Id.* at 193.)

Sharon Johnson told Romine that she and plaintiff "were having a problem getting documentation in," particularly original receipts for expenses.  (*Id.* at 88-89.)  Sharon Johnson showed Romine "copies of hand written receipts" which plaintiff had submitted because the original "receipts had been lost."  (*Id.* at 89-90.)  Romine stated that original receipts are needed because "there is no way for the business office to know what money was spent on when all [it] had was somebody writing something out."  (*Id.* at 90.)  Sharon Johnson also reported to Romine that plaintiff allowed one of her subordinates to use defendant's vehicle for personal use.  (*Id.* at 140.)

Clara Johnson also told Romine about problems with missing receipts.  (*Id.* at 98.)  Both Clara and Sharon Johnson complained about incomplete and/or inaccurate time sheets for plaintiff's subordinates.  (*Id.* at 99-101.)  They told Romine "they had asked over and over and over and [over] again" for complete and correct information and "it was never done."  (*Id.* at 101.)

Romine testified that Cooper told him plaintiff "did not want to do direct care."  (*Id.* at 104.)  The job of House Manager involved direct care responsibilities about 75% of the

time.  (*Id*.)  He also said Cooper told him plaintiff was "allowing people to transfer without written approval."  (*Id*. at 143.)

Romine further testified that Cooper also told him about the flea problem, and that the problem should have been corrected before it became "a health risk to the clients and they had to evacuate the home."  (*Id*. at 107-08.)  He said Cooper told him about the "overall filthiness of the house."  (*Id*. at 114.)  Cooper did not recall having a meeting with Romine about problems with plaintiff's job performance.  (*Id*., Ex. 4 at 58.)  However , Romine's testimony regarding what Cooper told him is consistent with Cooper's testimony regarding her observations and with the write-ups.

Romine testified that Miranda Tucker told him she (Miranda Tucker) knew of occasions when there was no staff or inadequate staff at the house plaintiff supervised as an RSS.  (*Id*., Ex. 2 at 116, 123-25.)  Romine also said that Tucker reported plaintiff's house was unclean.  (*Id*. at 139.)  Tucker not only testified that Harris had "a lot" of deficiencies in her job performance (*id*., Ex.  3 at 33), she also stated that she noticed a lack of staff at Pinedale and two other homes.  (*Id*. at 33-34.)  Tucker reported her observations to Romine sometime after the first of July 2002.  (*Id*. at 75, 77-79, 87-89.)[2]

_____

[2]The record contains evidence of other performance problems.  However, because Romaine did not testify that he had been told of these incidents, the court finds evidence of these incidents irrelevant to the issue of whether defendant was motivated to terminate plaintiff based on reports of performance problems.  The court has not considered this evidence in deciding Defendant's Motion for Summary Judgment.

Sometime after plaintiff was terminated, Montgomery was promoted to Area House Manager. The Area House Manager position, which was approved October 22, 2002, is described as:

> [A] supervisory position with responsibilities for direct care, scheduling and supervision of Residential Assistants in a home, as well as monitoring the day-to-day operation of the home(s) to ensure quality of service. At the request of the CEO and/or Program Specialist/Supervisor the Area House Manager will provide assigned House Managers with technical assistance in the day to day operations of their homes.

(*Id.*, Ex. 16.) The Area House Manager is on the same level as the House Manager, except that the Area House Manager would give technical assistance to the House Managers when requested to do so by a Program Specialist/Supervisor. (*Id.*, Ex. 2 at 63-64.) The Area House Manager did not supervise other House Managers or their direct care staff. (*Id.*, Ex. 16.)

## C. DISCUSSION

Plaintiff makes two claims of discriminatory treatment: (1) her alleged demotion from RSS to House Manager and (2) her termination. Because plaintiff relies upon circumstantial evidence to prove her claims, the court's analysis of her claims is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). The Supreme Court has explained this framework as follows:

17

First, the plaintiff must establish a prima facie case of discrimination. [After the plaintiff, established a prima facie case of discrimination,] [t]he burden . . . shift[s] to [defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [If defendant meets this intermediate burden], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non.

*Id*. at 142-43 (internal citations and quotations omitted).

### 1. Demotion Claim

Plaintiff claims that she was "demoted" from RSS to House Manager, while Montgomery was allowed to remain an RSS, because of her age. Defendant contends that plaintiff was not "demoted;" rather, she was reassigned to the House Manager position when the Board eliminated the RSS position.

Generally, "plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)(citations omitted). Therefore, in order to establish a prima facie case of discrimination, plaintiff must establish that the change in her position from RSS to House Manager was an adverse employment action in contrast to Montgomery's change in position from RSS to House Manager.

To be considered "adverse," an employment action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'" *Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004), cert. denied, No. 04-1099

18

(April 18, 2005).  Demotion is an ultimate employment decision.  However, the court finds that plaintiff's salary remained the same, she retained supervisory authority over resident care employees, and her RSS position was eliminated.  Therefore, the court finds that the change in plaintiff's position was not a demotion.

Because plaintiff compares herself to Montgomery, she must establish that the change in her job duties was an adverse when compared to the change in Montgomery's job duties.

The court notes "not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001)(citations omitted).  In discussing the "adverse employment action" element in a Title VII case, the Eleventh Circuit Court of Appeals has held:

> [I]t is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way.  Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.  We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a ***serious and material*** change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id*. at 1239 (emphasis in original).

The court finds that the only difference between plaintiff's job duties as a House Manager and Montgomery's duties as a House Manager was Montgomery on occassion provided technical assistance – checking logbooks and counting pills – at other homes.

19

However, differences in work assignments are generally not adverse employment actions because such claims "strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Id*. at 1244 (citations omitted). Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Id*. "In the vast majority of instances, . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress . . . ." *Id*. at 1245 (citations omitted).

No reasonable person would view the decision to assign limited additional duties to Montgomery, and not to plaintiff, was of such a detrimental character as to work a ***serious and material*** change in the terms, conditions, or privileges of plaintiff's employment. The court finds that plaintiff has not established a disputed issue of fact as to whether her change in position was a demotion or an otherwise an actionable adverse employment action. Therefore, defendant is entitled to judgment as a matter of law as to plaintiff's demotion claim.

### 2. Termination

Plaintiff contends that she was terminated because of her age. Defendant contends that it is entitled to judgment as a matter of law as to this claim because: 1) plaintiff cannot establish a prima facie case of age discrimination; and, 2) even if she could establish a

prima facie case, she cannot establish that the articulated reason for its decision is pretextual and that plaintiff's age was the real reason defendant terminated her.

### 1. Prima facie case

The Eleventh Circuit has held:

> In an ADEA case involving discharge, demotion, or failure to hire, a plaintiff may establish a prima facie case by showing: (1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position that he sought or from which he was discharged; and (4) that he was qualified to do the job for which he was rejected.

*Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998)(citations omitted). Defendant contends that plaintiff cannot make a prima facie for termination due to her age, because plaintiff cannot establish that she was "qualified" for the position "because she failed to meet the performance expectations of her employer." (Def. Br. in Supp. of Motion for Summ. J. at 14.) The court rejects that argument.

In this Circuit, "plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification." *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999)(internal quotations and citations omitted); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). "[A]llegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a prima facie case has been

established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination." *Damon*, 196 F.3d at 1360.

In this case, plaintiff was interviewed and hired for the position of House Manager less than three weeks before Romine moved to have her terminated.  She had performed her previous RSS job for several years at least in a qualified manner.  The job duties of the RSS and the House Manager positions were substantially similar and required similar qualifications.  (*See* doc. 22, Exs. 14 and 15.)  Therefore, despite the alleged deficiencies in her job performance as a House Manager, the court finds plaintiff has sufficiently established, for purposes of a prima facie case, that she was at least minimally "qualified" for that position at the time of termination.  Therefore, the issue of whether or not plaintiff was "disqualified" because of her alleged performance problems is reserved for the court's "evaluat[ion of] the pretextual nature of [defendant's] proffered nondiscriminatory reasons for [plaintiff's] termination."  *See Damon*, 196 F.3d at 1360.

## 2. Defendant's Articulated Non-Discriminatory Reason

According to defendant, Romine recommended plaintiff's termination, and the Board voted to terminate her based on reports about her poor job performance.  This articulated reason for plaintiff's termination is sufficient to shift the burden back to plaintiff to establish that the reason is unworthy of credence.

22

### 3. Pretext

To establish pretext, plaintiff must present sufficient evidence that reports of her poor job performance was not the real reason Romine recommended and the Board approved her termination. She cannot establish that defendant's articulated reason, *i.e.,* the reports of poor performance, is a pretext for discrimination by showing merely that the ***reports*** were untrue; she must show that defendant did not rely upon those reports when it decided to terminate her. In other words, Harris must show that defendant's articulated reason for firing her is not the real reason it did so. The Eleventh Circuit has held:

> In analyzing claims like [plaintiff's], we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [defendant's] conclusion that [plaintiff] was an unsatisfactory employee. We are not interested in whether the conclusion is a correct one, but whether it is an honest one. Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether [defendant's] proffered reasons were a coverup for a discriminatory decision. [The court is] not in the business of adjudging whether employment decisions are prudent or fair. Instead, [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)(internal citations and quotations omitted). "[A]rguing about the accuracy of [defendant's] assessment [of plaintiff's performance] is a distraction because the question is not whether [defendant's] reasons for a decision are ***right*** but whether [defendant's] description of its reasons is ***honest***." *Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)(internal citations and quotations omitted; emphasis in original).

23

Plaintiff's evidence of pretext consists largely of evidence of her lack of responsibility for problems in her home, evidence that Romine did not get her side of the story before recommending her termination, and evidence that Cooper did not remember a meeting with Romine.[3]  This evidence is not sufficient to establish that defendant's articulated reason for plaintiff's termination is a lie.  The record contains evidence that Romine presented numerous complaints about plaintiff's job performance to the Board and that the Board, based on these reports, terminated plaintiff.

Because plaintiff has failed to rebut the articulated reason for her termination, defendant's Motion for Summary Judgment as to her termination claim is due to be granted.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are not material facts in dispute and that defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 17); denying plaintiff's Motion to Strike Defendant's Brief in Support of Motion for Summary Judgment, (doc. 19); granting in part and denying in part defendant's Motion to Strike Portions of Declarations, (doc. 24); denying defendant's Motion to Strike Portions of Plaintiff's Statement of Facts, (doc. 25); denying plaintiff's Motion to Strike Defendant's Reply Brief, (doc. 26); and granting plaintiff's

---

[3]Cooper did not deny reporting plaintiff's problems to Romine; as noted above, she simply testified she did not remember a meeting.  (Doc. 22, Ex. 4 at 58.)  The evidence is not disputed, however, that Cooper actually wrote plaintiff up for the things Romine contends she reported to him.  (*See* doc. 16, Ex. I.)  Moreover, the write-ups were sent to Sharon Johnson, who was at the Board meeting and also made reports to Romine.  (*Id*.)

Motion to Strike Romine Affidavit, (doc. 27), will be entered contemporaneously with this

Memorandum Opinion.

**Done**, this 30th day of September, 2005.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

25